Wesley Hottot (TX Bar No. 24063851)*
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)
whottot@ij.org

Attorney for Plaintiffs

* Admitted *pro hac vice*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **SPEED'S AUTO SERVICES GROUP, INC**. d/b/a Towncar.com, an Oregon Corporation, and **FIESTA ENTERPRISES, LLC** d/b/a Fiesta Limousine, an Oregon Limited Liability Company, | **Case No. 3:12-cv-00738-AC** |
| **PLAINTIFFS**, | **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** Request for Oral Argument |
| v. | |
| **CITY OF PORTLAND, OREGON**, **CITY OF PORTLAND REVENUE BUREAU**, **PRIVATE FOR-HIRE TRANSPORTATION BOARD OF REVIEW**, and **THOMAS W. LANNOM**, in his official capacity as Revenue Bureau Director, | |

### DEFENDANTS.

Plaintiffs Speed's Auto Services Group, Inc. and Fiesta Enterprises LLC oppose

Defendants' motion to dismiss their equal protection and substantive due process causes of

action and hereby respond to Defendants' supporting memorandum of law.  *See* Docket

Nos. 16-17.

## INTRODUCTION

Plaintiffs' lawsuit challenges the constitutionality of three of the City of Portland's limousine and sedan regulations.  The first requires limousine and sedan operators to charge at least $50 for trips between downtown Portland and Portland International Airport.  The second requires them to charge at least 35% more than the prevailing taxicab fare for routes elsewhere in the city.  The third requires them to wait at least 60 minutes between the time a customer requests service and the time the customer is picked up.  These three regulations are unconstitutional because they serve no purpose other than protecting taxicab companies from competition by limousine and sedan companies.

The City makes two arguments in support of its motion to dismiss for failure to state a claim.[1]  Initially, the City suggests that plaintiffs in every economic liberty case must allege the policy in question acts as a "complete barrier" to their pursuit of their chosen occupation and, the City reasons, because the Plaintiffs in this case are still operating their businesses, they cannot challenge Portland's laws.  This argument ignores allegations in the Complaint that the City has already threatened to suspend Plaintiffs' operating permits for offering online deals that violate the minimum fares, and that suspension or revocation of their permits would similarly result if Plaintiffs are later charged with violating the minimum wait time.  Obviously, the suspension or revocation of Plaintiffs' operating permits would be a "complete barrier" to the continued operation of their businesses.  The City's argument thus fails on the face of the Complaint.

---

[1] Defendants' moving papers were filed on behalf of the City of Portland, the City of Portland Revenue Bureau, the Private For-Hire Transportation Board of Review, and Thomas W. Lannom in his official capacity as Revenue Bureau director.  *See* Docket No. 16.  Since Defendants filed their motion, however, the Court has accepted the parties' stipulated dismissal of the Revenue Bureau, the Board, and Mr. Lannom, so that only the City of Portland remains as a defendant in this case.  *See* Docket No. 24.  For this reason, Plaintiffs only address the City of Portland in this brief, although they note that their arguments for denying the motion would apply with equal force to the three recently dismissed defendants.

Second, the City suggests that this case can be decided based on nothing more than the statement of purpose in the preamble to its vehicle-for-hire regulations.  Were this the case (and it is not), the government could shield itself from constitutional review simply by drafting a salutary statement of purpose, no matter how divorced that statement of purpose might be from the real purpose for, and operation of, the law.  Ninth Circuit precedent and precedent from other circuits nevertheless shows that the government needs real justifications—not merely a statement of policy—for a law to survive rational basis review. While deferential, rational basis review is not as toothless, or as pointless, as the City suggests.

The City's motion to dismiss should be denied for the simple reason that, under Ninth Circuit precedent, Plaintiffs' equal protection and substantive due process claims turn on facts—not just self-serving statements of purpose—and therefore this case cannot be decided on the pleadings alone.

## ARGUMENT

### I.    PLAINTIFFS CAN CHALLENGE ECONOMIC REGULATIONS AFFECTING THEIR BUSINESSES WHILE CONTINUING TO OPERATE THEIR BUSINESSES.

The City argues Plaintiffs' claims fail as a matter of law because their Complaint (Docket No. 1) fails to allege that the minimum fares and 60-minute minimum wait time act as a "complete barrier" to Plaintiffs' ability to operate limousine and sedan businesses. Defs.' Mem. of Law in Supp. of Defs.' Mot. to Dismiss (Docket No. 17) at 11-12.[2]  The City implies that only a plaintiff who has completely ceased operating his business because of a law may legally challenge that law.  *See id.* at 12 ("Plaintiffs are lawfully engaged in the for-hire transportation business, and therefore the City of Portland is not preventing

---

[2] Cited as "Mem. in Supp. of MTD" below.

them from pursuing their chosen profession.").  To support this argument, the City relies on a line of cases that only undermine its position.

While the City correctly articulates the standard of review for a motion to dismiss, *see* Mem. in Supp. of MTD at 4, it misapplies that standard by ignoring key allegations in the Complaint that make clear that Plaintiffs' businesses are currently under threat of total destruction if they continue to charge less than the minimum fares or pick up customers in less than an hour.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  Therefore, even if the City's reading of the law were correct, it would not justify dismissal of Plaintiffs' case.

### A.    Plaintiffs allege that their businesses will be completely destroyed if the City continues to enforce the minimum fares and minimum wait time against them.

Even accepting for the sake of argument that Plaintiffs must show a "complete barrier" to operating their business, Plaintiffs have more than sufficiently alleged that the minimum fares and 60-minute minimum wait time act as such a barrier.  In their Complaint, Plaintiffs allege that the City has threatened them, in writing, with suspension of their operating permits and a combined $895,000 in penalties for offering rides that violate the minimum fares.  Compl. ¶¶ 36-38, 49-51.  These threats of enforcement have prevented Plaintiffs from promoting their services to new customers and Plaintiffs specifically allege that this in turn threatens the viability of their businesses.  *Id.* ¶ 7.  Plaintiffs also point out that the City may revoke, restrict, or refuse to renew their operating permits if they do not comply with the 60-minute minimum wait time.  *Id.* ¶ 69.

Moreover, Plaintiffs allege that, as a direct result of the minimum fares and minimum wait time, they have lost hundreds of new customers and the goodwill of their existing customers. *Id.* ¶¶ 43-45, 57-59, 65, 67-68. Plaintiffs allege they have lost substantial income as a direct result of the City's policies and its enforcement of those policies. *Id.* ¶ 66. So the viability of Plaintiffs' businesses is currently threatened by the existence of the policies that they challenge in this lawsuit and by the City's power—and indeed its explicit threat—to pull Plaintiffs' operating permits for continuing to violate those policies. Under the circumstances, Plaintiffs have alleged a sufficiently "complete barrier" to their continued operation to survive a motion to dismiss.

**B.     Courts consider the constitutionality of regulations before those regulations destroy a plaintiff's business.**

Even if Plaintiffs had not alleged (as they have) that the minimum fares and 60-minute minimum wait time threaten the viability of their businesses, the City mischaracterizes the type of "complete prohibition of the right to engage in a calling" that the Ninth Circuit requires before a plaintiff can bring a substantive due process challenge to an economic regulation. *See* Mem. in Supp. of MTD at 12 (quoting *Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999)).

*Dittman* involved a licensed acupuncturist who refused to disclose his Social Security number to the State of California after a new law required its disclosure to renew certain occupational licenses, including acupuncturist's licenses. 191 F.3d at 1024. The acupuncturist brought a substantive due process challenge to the law and the district court granted summary judgment for the government. *Id.* at 1030. While the Ninth Circuit affirmed on the merits, rejecting the acupuncturist's substantive due process claim, it did not hold that he was barred from bringing the claim altogether, as the City suggests in this

case. *See id.* at 1029-30. On the contrary, the Ninth Circuit held that occupational prerequisites like the disclosure of one's Social Security number, mandatory continuing education, and testing requirements are the kind of "complete prohibitions" that will support a substantive due process claim for the deprivation of a person's right to pursue his chosen profession. *Id.*

Like the disclosure requirement in *Dittman*, Portland's minimum fares and 60-minute minimum wait time are "complete prohibitions" because the Plaintiffs in this case, like the acupuncturist in *Dittman*, have two choices: comply with the law or forfeit their right to operate. Plaintiffs are aware of no case—in any circuit—holding that a business must actually go out of business before it can bring a constitutional challenge to an economic regulation that plainly impacts the business.[3] Were there such a case (and Plaintiffs doubt that one exists), it would have profound implications not only for economic liberty jurisprudence, but also for standing jurisprudence, which requires a plaintiff to have been injured, not altogether destroyed, before bringing a case. *See, e.g.*, *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 61 (9th Cir. 1994) ("It is well settled that a provider of goods or services has standing to challenge government regulations that directly affect its customers and restrict its market.").

## II.    PLAINTIFFS STATE A CLAIM UNDER THE EQUAL PROTECTION GUARANTEE OF THE FOURTEENTH AMENDMENT.

In this case, Plaintiffs allege that Portland's minimum fares and 60-minute minimum wait time address no legitimate health or safety concerns, that they harm

---

[3] The City also cites *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999) and *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 65-66 (9th Cir. 1994). Both cases involved temporary impediments to the plaintiffs' businesses—in *Conn*, a lawyer was searched by the police while attending a grand jury, but his practice was not otherwise impacted; and in *Wedges/Ledges*, the manufacturer of a coin-operated game sued over a temporary ban of the game while new licenses were being issued. Portland's minimum fares and 60-minute minimum wait time are not temporary inconveniences of the kind at issue in *Conn* and *Wedges/Ledges*, but are, rather, permanent restrictions on how Plaintiffs may operate their businesses.

consumers by making them pay more and wait longer than they otherwise would, and that

they were designed to protect taxicab companies from competition by limousine and sedan

companies. Compl. ¶¶ 5, 22-30. At this stage of the litigation, the City cannot and does

not respond to these allegations with reference to any facts showing that the challenged

provisions are anything other than protectionist policies. Instead, the City relies on its own

definition of what a limousine and sedan company must be. *See* Mem. in Supp. of MTD at

18-19 ("[S]edans and limousines must be 'expensive' vehicles that provide 'luxury'

transportation, where taxicabs do not"). And it relies on the statement of purpose that it

wrote for the preamble to its law. *Id.* at 19 (arguing the challenged provisions exist to

"promote competition," "promote welfare," and "ensure a balanced transportation system

across the City of Portland") (citing Portland City Code § 16.40.010(A)). For purposes of

the City's motion to dismiss, however, it is sufficient that Plaintiffs allege Portland's

minimum fares and 60-minute minimum wait time serve no function other than to protect

taxicab companies from competition by limousine and sedan companies. Compl. ¶¶ 22-29.

The City cannot contravene those allegations with run-of-the-mill legislative rhetoric.

   In fact, the City acknowledges that economic protectionism is an illegitimate

justification for governmental regulation under the rational basis test. *See* Mem. in Supp.

of MTD at 16 (citing *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978);

*Merrifield v. Lockyer*, 547 F.3d 978, 992 n.15 (9th Cir. 2008)). But it goes on to suggest

that this case can be decided at the motion-to-dismiss stage because Portland has other,

legitimate reasons for its laws. *Id.* at 19 (referencing the statement of policy in the City's

vehicle-for-hire rules). In doing so, the City relies on, but fails to recognize the

significance of, the three most analogous cases—*Merrifield, Executive Town & Country*,

and *Bokhari*—each of which was decided based on actual evidence, and not at the motion-to-dismiss stage.

A.    *Merrifield*

In *Merrifield v. Lockyer*, the Ninth Circuit struck down California's "structural pest control" license on rational basis grounds.  The district court ruled in favor of the government only after hearing cross-motions for summary judgment and weighing the parties' evidence.  547 F.3d 978, 982 (2008).[4]  Even though the Ninth Circuit acknowledged there were conceivable justifications for the state's pest control license, it reversed in part and held the license unconstitutional because it only served to protect one class of pest controllers from competition by another class.  *Id.* at 991-92.

California's definition of "structural pest control" covered plaintiff Alan Merrifield's business of installing spikes, screens, and other mechanical devices on buildings in order to keep pests like raccoons, squirrels, rats, pigeons, and bats away from homes and businesses.  *Id.* at 980.  The Court upheld the state's licensing requirement on substantive due process grounds because the educational prerequisites for the license included instruction in handling dangerous pesticides and dead animals, both of which pest controllers like Merrifield regularly encountered.  *Id.* at 986-88.

The Ninth Circuit nevertheless struck down the licensing requirement on equal protection grounds because, while California required Merrifield to get a license, it exempted anyone who focused exclusively on mice, rats, or pigeons.  *Id.* at 981-82.  The Court held this exemption unconstitutional to the extent it did not cover Merrifield's business.  *Id.* at 991-92.  The Court observed that the same rationales supporting a license for pest controllers who, like Merrifield, worked with bats—the handling of dead animals

---

[4] The district court's opinion is reported at *Merrifield v. Lockyer*, 388 F. Supp. 2d 1051 (N.D. Cal. 2005).

and hazardous pesticides—would support a license for controllers who worked with animals not included in the licensing requirement. *Id.* In fact, it appeared likely that the exempted pest controllers were *more* likely to interact with dangerous pesticides than were those, like Merrifield, who had to get the license. *Id.* at 992.

The Ninth Circuit found the function of this licensing requirement was to "specifically single[] out" certain businesses for anti-competitive treatment. *Id.* at 991. In striking down the requirement, the Ninth Circuit endorsed the Sixth Circuit's opinion in *Craigmiles v. Giles,* 312 F.3d 220 (2002), which squarely held that economic protectionism cannot support an otherwise irrational economic regulation. 547 F.3d at 991 n.15.

In *Craigmiles*, the Sixth Circuit struck down a Tennessee funeral-licensing law that prohibited unlicensed businesses from selling caskets. 312 F.3d at 222-23. The district court had denied the government's motion to dismiss and motion for summary judgment. *Craigmiles v. Giles*, No. 1:99-CV-304, 2000 U.S. Dist. LEXIS 22435 (E.D. Tenn. July 18, 2000). Later, the district court held a full trial on the merits. *Craigmiles v. Giles*, 110 F. Supp. 2d 658 (E.D. Tenn. 2000). Because there was no evidence in the record of a rational relationship between the state's purported justifications for casket-retailer licensing and the licensing scheme itself, and with only the constitutionally illegitimate purpose of economic protectionism remaining to support the law, the Sixth Circuit affirmed the district court and held that economic protectionism fails even the relatively permissive rational basis test.[5] 312 F.3d at 228-29.

---

[5] Only the Tenth Circuit has rejected this core holding of *Craigmiles*. *See Powers v. Harris*, 379 F.3d 1208, 1221-22 (10th Cir. 2004) ("[W]hile baseball may be the national pastime of the citizenry, dishing out special economic benefits to certain in-state industries remains the favored pastime of state and local governments"). The Ninth Circuit has considered this circuit split, however, and has embraced the Sixth Circuit's rule. *See Merrifield*, 547 F.3d at 991 n.15.

It is hardly surprising that the Ninth Circuit endorses the Sixth Circuit's opinion in *Craigmiles*. The conclusion that economic protectionism is an illegitimate—and therefore unconstitutional—justification for a law under the Fourteenth Amendment's rational basis test is in keeping with a broad consensus that economic protectionism can never be a legitimate governmental objective under any part of the Constitution. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983) (distinguishing between legitimate state ends and "providing a benefit to special interests" in a Contracts Clause case); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981) (recognizing a "virtually *per se* rule of invalidity" applies to "simple economic protectionism" under the Commerce Clause) (citation omitted); *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, 240 (5th Cir. 2011) (recognizing that, under the Fourteenth Amendment, "naked economic preferences are impermissible to the extent that they harm consumers"); *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 631 (5th Cir. 2010) (Contracts Clause); *Craigmiles*, 312 F.3d at 224, 228-29 (Fourteenth Amendment); *St. Joseph Abbey v. Castille*, 835 F. Supp. 2d 149, 153 (E.D. La. 2011) (same); *Santos v. City of Houston*, 852 F. Supp. 601, 607-608 (S.D. Tex. 1994) (same).

The City suggests a distinction without a difference when it argues that Plaintiffs cannot make out an equal protection claim because the regulations in this case do not include express exemptions for taxicabs like the statutory exemptions for certain types of pest controllers in *Merrifield*. *See* Mem. in Supp. of MTD at 19. Nothing in *Merrifield* suggests that express exemptions are required for an equal protection challenge to a protectionist government policy. In any case, however, the policies challenged in this case

are protectionist on their face and reflect an attempt by the government to benefit taxicab companies at the expense of limousine and sedan companies and their customers.  This type of protectionism is exactly what *Merrifield* prohibits, notwithstanding the fact that the City has chosen to frame its policies affirmatively instead of in terms of exemptions.

*Merrifield* (and the many cases like it) would make no sense if the government could avoid suit altogether simply by asserting that the challenged regulation actually *does* promote competition.  Whether a policy is merely protectionist or in fact furthers other, legitimate governmental ends is a mixed question of fact and law that is best decided at summary judgment, as in *Merrifield*, or after a full trial, as in *Craigmiles*.  For this reason, Plaintiffs claims cannot be dismissed on the face of the Complaint.

### B.    *Executive Town & Country*

The City correctly points out that one federal appeals court has considered and upheld a $50 minimum fare for limousine service.  *See* Mem. in Supp. of MTD at 10-11 (citing *Executive Town & Country Servs., Inc. v. City of Atlanta*, 789 F.2d 1523 (11th Cir. 1986)).  But again, the City fails to account for the fact that the case was decided after a bench trial and not at the motion-to-dismiss stage.  *See Executive Town & Country*, 789 F.2d at 1525.

In any case, the minimum fare in *Executive Town & Country* satisfied the Eleventh Circuit's version of the rational basis test "with little room for comfort."  *Id.* at 1528. Plaintiff Town & Country was a car service doing approximately 90% of its business in the form of $18 runs to Atlanta-Hartsfield International Airport.  *Id.* at 1525, 1527.  The company brought a Commerce Clause and equal protection challenge to Atlanta's $50

minimum charge.  On appeal, the government argued its minimum fare guaranteed each of the following:

> (1) that each of [the different] modes of transportation can find a niche in which to fit in the City's transportation network; (2) that everyone within the City, no matter what his level of affluence, has affordable transportation available; (3) that the operators of each type of transportation [must] earn enough to permit them to meet the operational requirements (e.g., insurance, maintenance, etc.) which have been set by the City; and (4) that each of these different modes will be able to attract the custom of a sufficient number of patrons to maintain its economic viability.

*Id.* at 1527 n.8 (alterations in original).

The Eleventh Circuit called all four of these arguments "weak" and "not very compelling in a free market system."  *Id.* at 1527-28.  The Court nevertheless upheld the minimum fare on equal protection grounds because Town & Country failed to prove there was no possible legislative rationale for enacting it.  *Id.* at 1528.  While Portland makes similar arguments here, the district court in *Executive Town & Country* initially restrained enforcement of Atlanta's minimum fare, held a bench trial, and then dissolved its temporary restraining order.  *Id.* at 1525.  The Eleventh Circuit therefore had a complete record on which to judge, first, what Atlanta's justifications for its law actually were and, second, whether or not those justifications were supported by evidence.  Here, the City cannot avail itself of the four justifications approved of—but fundamentally questioned— under the facts of *Executive Town & Country* because, unlike Atlanta, the City has yet to offer any facts suggesting those justifications actually pertain to Portland's vehicle-for-hire market and Plaintiffs, unlike the plaintiffs in *Executive Town & Country*, have been given no opportunity to rebut those justifications with evidence.[6]

---

[6] In its brief, the City suggests that its justifications can be divined from the definitions in its vehicle-for-hire laws and from the statement of purpose associated with those laws.  *See* Mem. in Supp. of MTD at 12, 18. The justifications suggested by the City's lawyers at this early stage of the litigation may or may not turn out

Moreover, *Executive Town & Country* did not involve the kind of economic protectionism claim that is central to this case. Nor does the Eleventh Circuit have precedent rejecting economic protectionism as a basis for regulation, as the Ninth Circuit does. Accordingly, Portland's minimum fares and minimum wait time are not entitled to the "little room for comfort" that Atlanta's minimum fare enjoyed under the Fourteenth Amendment. *See Executive Town & Country*, 789 F.2d at 1528.

**C.**    *Bokhari*

The most analogous case available is *Bokhari v. Metropolitan Government of Nashville & Davidson County*, in which the U.S. District Court for the Middle District of Tennessee denied the government's motion to dismiss claims nearly identical to the claims at issue in this case. No. 3:11-00088, 2012 U.S. Dist. LEXIS 6054 (M.D. Tenn. Jan. 19, 2012). The plaintiffs in *Bokhari* challenged Nashville's $45 minimum fare for limousine and sedan service, as well as a handful of other operational requirements, based on the equal protection and substantive due process guarantees of the Fourteenth Amendment. *Id.* at *3-5. The *Bokhari* plaintiffs alleged that Nashville had unconstitutionally passed the challenged requirements into law for no purpose other than to protect taxicab companies and expensive limousine companies from competition. *Id.* at *3-6. The court denied the government's motion to dismiss because, under the Sixth Circuit's *Craigmiles* precedent, it was sufficient that the plaintiffs alleged Nashville's regulations were passed for no reason other than to protect other businesses from competition. *Id.* at *10-11. The same is true in this case, and the City's motion to dismiss should be denied for the same reason.

---

to be the justifications on which the City ultimately chooses to rely. If for no other reason than that the Court needs to know what the City's justifications for the laws actually are, this case cannot be dismissed on the face of the Complaint. Someone from the City will have to testify to specific justifications in the form of an interrogatory response, at a deposition, or at trial before the City's justifications are in evidence.

The City cites *Bokhari*, but ignores the court's ruling denying the government's motion to dismiss and focuses instead on a later ruling denying the plaintiffs' motion for a preliminary injunction.  *See* Mem. in Supp. of MTD at 11 (citing 2012 U.S. Dist. LEXIS 49396 (M.D. Tenn. April 9, 2012)).  Obviously, the standard for granting a preliminary injunction is much more stringent than the standard for surviving a motion to dismiss. While the court in *Bokhari* ruled that the plaintiffs were unlikely to succeed on the merits of their constitutional claims, it held a day-long evidentiary hearing before denying the injunction request and made clear that it regarded evidence as essential to its ultimate decision on those claims.  2012 U.S. Dist. LEXIS 49396, at *2.  As with *Merrifield* and *Executive Town & Country*, the City relies on *Bokhari* without appreciating the procedural posture of the case.  While each of the cases discussed above might be used to support the City's position at a later stage of the litigation, they are of no help to the City at this stage.

III.    **PLAINTIFFS STATE A CLAIM UNDER THE SUBSTANTIVE DUE PROCESS PROTECTIONS OF THE FOURTEENTH AMENDMENT.**

In cases like this one, where the plaintiff challenges an economic regulation as violating both the equal protection and substantive due process protections of the Fourteenth Amendment, courts generally view the two constitutional inquiries as indistinct from one another because both are governed by the same rational basis test.  *See, e.g.*, *Craigmiles*, 312 F.3d at 223-24 (addressing equal protection and substantive due process claims simultaneously).  However, in *Merrifield*, the Ninth Circuit questioned the wisdom of conflating equal protection and substantive due process analysis in this way.  *See* 547 F.3d at 985 & n.10.  The Ninth Circuit pointed out that equal protection precedents should govern cases involving allegations that one business is being unconstitutionally treated differently from other types of businesses, while substantive due process precedents should

govern cases where the plaintiff challenges an allegedly unconstitutional barrier to practicing her chosen profession.  *Id.*  Plaintiffs make both types of claims in this case, and for this reason they have brought both types of claims.  *See* Compl. ¶¶ 76-91.

While the equal protection claims in *Merrifield* were ultimately successful, the substantive due process claims were not.  After reviewing the extensive evidence submitted in support of the cross-motions for summary judgment in that case, the Ninth Circuit held that the California's structural pest control license was sufficiently rational to pass substantive due process analysis because the state's licensure requirements furthered its interest in protecting structural pest controllers (and others) from pesticides, the dangers of handling dead animals, and the many injuries that could occur when workers climb atop structures to combat pests.  *Id.* at 986-88.  Because the state was able to demonstrate—with actual evidence—that it had legitimate health and safety reasons for requiring a license, it did not matter for substantive due process purposes that the license disfavored one type of pest controller over other types.

Conversely, in *Nebbia v. New York*, the Supreme Court viewed a substantive due process challenge to New York's fixed milk prices as a "more serious question" than whether the price fixing violated equal protection principles.  291 U.S. 502, 522 (1934).  Like all of the cases discussed above, *Nebbia* was not decided on a motion to dismiss; it was decided after a trial.  *See id.* at 515.  The Supreme Court weighed extensive evidence in the record about the importance of milk to a healthy diet, the wild fluctuations in the retail and wholesale price of milk in New York during the Depression years, and the effectiveness of setting minimum and maximum milk prices in combating the many proven

"factors of instability" in the milk market. *Id.* at 516-18. Thus, *Nebbia* involved clear evidence of a public health and safety justification for the law at issue.

While there may have been real health and safety reasons for requiring all pest controllers to obtain licenses in *Merrifield*, and real health and safety reasons for fixing the price of milk during the Depression in *Nebbia*, the same public health exigencies simply do not exist in this case. Moreover, the Sixth Circuit also weighed colorable health and safety arguments in *Craigmiles*—where the government claimed, for example, that licensing funeral directors helped guarantee the integrity of caskets against leakage and the possible contamination of groundwater—but the Court nevertheless reviewed evidence to the contrary and held that the law violated the plaintiffs' substantive due process rights. 312 F.3d at 225-26, 228-29.

Even if the City is ultimately able to identify persuasive health and safety justifications for requiring limousine and sedan businesses to charge a minimum price and to wait an hour before picking up their customers (and Plaintiffs are skeptical that the City ultimately can), these cases only reinforce the fact that the City's justifications must be based on evidence and cannot be fully adjudicated at the motion-to-dismiss stage.

## IV.    PLAINTIFFS ARE PRESERVING THEIR PRIVILEGES OR IMMUNITIES CLAIM UNDER THE FOURTEENTH AMENDMENT.

Finally, Plaintiffs have alleged that Portland's minimum fares and 60-minute minimum wait time violate their right to earn an honest living under the Privileges or Immunities Clause of the Fourteenth Amendment. Compl. ¶¶ 92-97. There can be little dispute that the Supreme Court's decision in the *Slaughter-House Cases* forecloses this claim, as it essentially rendered the Privileges or Immunities Clause "a vain and idle enactment, which accomplished nothing." 83 U.S. 36, 96 (1873) (Field, J., dissenting).

While Plaintiffs acknowledge that this Court is bound by the *Slaughter-House Cases*, they nonetheless seek to preserve this claim for further appellate review.

There is perhaps no proposition in American constitutional law on which there is greater unanimity than that the *Slaughter-House* majority is incorrect. As one scholar notes, "everyone" agrees on this point. Richard L. Aynes, *Constricting the Law of Freedom: Justice Miller, the Fourteenth Amendment, and the Slaughter-House Cases*, 70 Chi.-Kent L. Rev. 627, 627 (1994); *see also* Laurence H. Tribe, *American Constitutional Law* 1320-21 (3d ed. 2000) ("The textual and historical case for treating the Privileges or Immunities Clause as the primary source of federal protection from state rights-infringement is very powerful indeed."); Akhil Reed Amar, *The Bill of Rights* 213 (1998) (explaining "[t]he obvious inadequacy—on virtually any reading of the Fourteenth Amendment—of Miller's opinion" in *Slaughter-House*).

At least one Supreme Court Justice has also expressed interest in revisiting the Privileges or Immunities Clause "in an appropriate case." *See, e.g.*, *Saenz v. Roe*, 526 U.S. 489, 527-28 (1999) (Thomas, J., dissenting). Most recently in *McDonald v. City of Chicago*, __ U.S. __, 130 S. Ct. 3020 (2010), a majority of the Court declined to address the question, concluding that doing so was unnecessary for the outcome of the case. In *McDonald*, four justices voted to strike down Chicago's handgun ban, finding that the Second Amendment right to keep and bear arms was applicable to the states through substantive due process. Four justices disagreed and voted to uphold the ban.

The pivotal fifth vote in *McDonald* was Justice Thomas, who noted that, for all the disagreement between the two groups of four Justices, "neither side argues that the meaning they attribute to the Due Process Clause was consistent with public understanding

at the time of its ratification." *McDonald*, 130 S. Ct. at 3062 (Thomas, J., concurring). Justice Thomas agreed that the gun ban should be struck down, but instead proposed "a more straightforward path to this conclusion, one that is more faithful to the Fourteenth Amendment's text and history"—namely, the Fourteenth Amendment's "Privileges or Immunities Clause." *Id*. at 3058-59.

For purposes of this case, the most important point from *McDonald* is that the Supreme Court left the door open to restoring the Privileges or Immunities Clause to its rightful place in the Fourteenth Amendment in a future case.  As one court noted, after thoughtful consideration of the relevant history, "it may be time, as Justice Thomas suggests in *Saenz*, to take another look at the Privileges [or] Immunities Clause and its place within the Fourteenth Amendment." *Craigmiles*, 110 F. Supp. 2d at 667.  The only way for that to happen is for parties to assert and preserve privileges or immunities claims in appropriate cases, like this one.

## CONCLUSION

The City's motion to dismiss should be denied in part because Plaintiffs' equal protection and substantive due process causes of action state plausible claims upon which relief could be granted.  The motion should be granted, however, as to Plaintiffs' privileges or immunities cause of action because, under current precedent, that claim will admittedly fail before this Court.

RESPECTFULLY SUBMITTED this 31st day of August 2012.

INSTITUTE FOR JUSTICE


By: _____ /s/ Wesley Hottot _____

Wesley Hottot (TX Bar No. 24063851)*
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)
whottot@ij.org

Jeanette M. Petersen (WA Bar No. 28299)*
William R. Maurer (WA Bar No. 25451)*
Institute for Justice Washington Chapter
101 Yesler Way, Suite 603
Seattle, WA 98104
(206) 341-9300
(206) 341-9311 (fax)
jpetersen@ij.org
wmaurer@ij.org

Melinda J. Davison (OR Bar No. 930572)
Davison Van Cleve, PC
333 SW Taylor Street, Suite 400
Portland, OR 97204
(503) 241-7242
(503) 241-8160 (fax)
mjd@dvclaw.com

ATTORNEYS FOR PLAINTIFFS

* Admitted *pro hac vice*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 5,326 words, including headings, footnotes, and quotations, but excluding the caption, footer, signature block, and certificates of counsel.

_____/s/ Wesley Hottot_____
Wesley Hottot

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that I have served a true and correct copy of this Plaintiffs'

Response to Defendants' Motion to Dismiss on each attorney of record on this 31st day of

August 2012, as follows:

J. Scott Moede (OR Bar No. 934816)
Kenneth A. McGair (OR Bar No. 990148)
Office of City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
(503) 823-4047
(503) 823-3089 (fax)
scott.moede@portlandoregon.gov
kenneth.mcgair@portlandoregon.gov

ATTORNEYS FOR DEFENDANTS

By way of the Court's electronic filing system


           _____/s/ Wesley Hottot_____
           Wesley Hottot