UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SPEED'S AUTO SERVICES GROUP, INC., d/b/a Towncar.com, an Oregon Corporation, and FIESTA ENTERPRISES, LLC, d/b/a Fiesta Limousine, an Oregon Limited Liability Company, | Case No.: 3:12-CV-738-AC<br><br>OPINION AND ORDER |
| Plaintiffs, | |
| v. | |
| CITY OF PORTLAND, OREGON, CITY OF PORTLAND REVENUE BUREAU, PRIVATE FOR-HIRE TRANSPORTATION BOARD OF REVIEW, and THOMAS W. LANNOM, in his official capacity as Revenue Bureau Director, | |
| Defendants. | |

ACOSTA, Magistrate Judge:

*Introduction*

The sole remaining defendant in this action, City of Portland ("City"), seeks summary

judgment on the sole remaining claim[1] for violation of the Substantive Due Process Clause of the Fourteenth Amendment ("Substantive Due Process Clause") asserted by plaintiffs Speed's Auto Services Group, Inc., doing business as Towncar.com ("Speeds"), and Fiesta Enterprises, LLC, doing business as Fiesta Limousine ("Fiesta)(collectively referred to as "Plaintiffs") in the complaint filed in this court on April 26, 2012 (the "Complaint"). Plaintiffs assert that City regulations governing provision of private for-hire transportation services constitute economic protectionism of taxicab companies in violation of the Substantive Due Process Clause.

The court finds Plaintiffs have failed to present evidence supporting their allegations that the Regulations resulted in a complete bar to Plaintiffs' pursuit of a chosen occupation or deprived Plaintiffs of business goodwill. Accordingly, Plaintiffs have failed to support their claim under the Substantive Due Process Clause and the City's motion for summary judgment on this sole remaining claim is granted.[2]

*Background*

Plaintiffs are Oregon businesses that transport customers in and around Portland, Oregon, in luxury vehicles, such as town cars, limousines, and party buses (collectively "Executive Sedans"). Both are subject to City regulations setting minimum fares and wait times applicable to private for-hire transport companies using Executive Sedans that are not applicable to taxicab companies. The

/ / / / /

---

[1] The court previously dismissed Plaintiffs' claim under the equal protection and privileges and immunities clauses for failure to state a claim. *Speed's Auto Services Grp. v. City of Portland*, No. 3:12-CV-738-AC, 2013 WL 1826141 (D. Or. April 30, 2013).

[2] The parties have consented to jurisdiction by magistrate in accordance with 28 U.S.C. § 636(c)(1).

City's Revenue Bureau ("Bureau"), which is part of the City's Office of Management and Finance, issues permits to private for-hire transportation companies and vehicles, and enforces the City's transportation policies. (Lannom Dep. 10:11-23.) The ultimate authority for regulation of private for-hire transportation companies and vehicles rests in the City Council. (Hottot Decl. Ex. 17 at 40.)

The regulations governing private for-hire transportation are found in Chapter 16.40 of the City Code.[3] The purpose of Chapter 16.40 is to provide for the "safe, fair and efficient operation of taxicabs" while allowing the industry "to operate without unnecessary restraint." (McGair Aff. Ex. 8 at 1.) Chapter 16.40 is intended to provide "industry separation to protect order, public safety, public convenience, [and] basic transportation services." (Butler Dep. 79:22-24.)

Speed's has been in the private for-hire transportation business since 2005 and currently has a fleet of eleven Executive Sedans – ten town cars and one minibus. (Coe Dep. 14: 2-18; 16:11-17.) Speed's provides transportation services on a daily basis that comply with the City's regulations. (Coe Dep. 26:4-7.) Fiesta currently has a fleet of five Executive Sedans – three party buses, one Cadillac limousine, and one town car. (White Dep. 11:19-22; 13:13-16.) Fiesta is also currently providing regular transportation services, primarily between downtown and the Portland International Airport ("Airport"), in accordance with the City's regulations. (White Decl. ¶¶ 11, 22.)

This lawsuit was generated by the City's response to Plaintiffs' reduced-fare promotions on Groupon.com in the fall of 2011. Speed's offered Executive Sedan service for a one-way trip not exceeding thirty miles at a flat rate of $32.00, while Fiesta offered one-way trips in an Executive

/ / / / /

---

[3] The private for-hire transportation regulations relied on by the court are found in the current version of the Portland City Code attached to the Affidavit of Kenneth McGair as Exhibit 19.

Sedan to or from the Airport at the same flat rate. (McGair Aff. Ex. 16 at 1; Ex. 17 at 1.)

The City advised Plaintiffs in separate letters that the promotions violated § 16.40.480(B),[4] and that unless Plaintiffs cancelled the promotions, they would be assessed civil penalties in the amount of $635,500 for Speeds and $259,500 for Fiesta, and their company and vehicle permits would be suspended. (McGair Aff. Ex. 16 at 1; Ex. 17 at 1.) Plaintiffs cancelled the promotions, returned the amounts collected, were not fined, and continued their businesses uninterrupted.[5]

Plaintiffs object to three regulations: 1) the required one-hour wait time found in § 16.40.460 ("Wait-Time Regulation"); 2) the minimum flat rate for trips between the Airport and downtown found in § 16.40.480(A) ("Airport-Fare Regulation"); and 3) the minimum rate of at least thirty-five percent more than prevailing taxicab rates found in § 16.40.480(B) ("Minimum-Fare Regulation") (collectively, the "Regulations"). The Wait-Time Regulation requires that "[a]ll limousine and executive sedan service be provided on a prearranged basis." PORTLAND, OR., CITY CODE § 16.40.460(A). "'[P]rearranged' means that the reservation for services was made and documented with the validly permitted drive or transportation company at least 60 minutes prior to the transportation of the customer." CITY ADMIN. RULE 16.40.460-01.[6] The Airport-Fare Regulation provides that "[m]inimum flat rates apply for limousine and executive sedans that provide for-hire

/ / / / /

---

[4]Plaintiffs were not aware of the premium rate required by § 16.40.480(B). (Leatham Decl. ¶¶ 27; White Decl. ¶14.)

[5]Speed's had already provided services to several customers purchasing the Groupon.com promotion but the City did not fine Speed's for its violation of the regulation based on Speed's confusion about whether the promotion was legitimate. (DuFay Dep. 103:24-104:7.)

[6]The current version of the administrative rules supporting the private for-hire transportation regulations relied on by the court are attached to the Affidavit of Kenneth McGair as Exhibit 6.

transportation service between the airport and Portland's Downtown Core and/or the AMTRAK station (in either direction) whether paid by the passenger or a third party." PORTLAND, OR., CITY CODE § 16.40.480(A). The current minimum flat rate, which is prescribed in the administrative rules, is $50.00 per trip. CITY ADMIN. RULE. Rule 16.40.480-01. The Minimum-Fare Regulation requires that "[r]ates charged for limousine and executive sedan services must be at least 35 per cent higher than the prevailing taxicab rates for the same route."[7] PORTLAND, OR., CITY CODE § 16.40.480(B)[8].

Gary Coe, majority owner and president of Speed's ("Coe"), complains that the Wait-Time Regulation prevents Speed's from providing Airport-to-downtown customers rides to a restaurant immediately after dropping them off at their original destination, and the Airport-Fare Regulation and Minimum- Fare Regulations (collectively the "Fare Regulations) restrict Speed's ability to offer promotional offers based on a reduced price. (Coe Dep. 9:23-24;10:13-16; 26:8-21.) Coe explained that Speed's does not make a net profit on a trip from the Airport to downtown at the current minimum rate of fifty dollars but believes that with enough trips, the rate would be profitable. (Coe Dep. 28:11-17; 43:7-11.) Coe has no problem with Executive Sedans charging more than taxicabs, wants to be able to charge more than taxicabs, and feels Executive Sedan service is worth more than taxicab service. (Coe Dep. 41:22 - 42:3.) In fact, Coe would like to be the "high-price guy" and
/ / / / /

---

[7]The term "prevailing taxicab rates" refer to the maximum meter rate a taxicab can charge which is set by the City. (Butler Dep. 37:22-38:7.)

[8]This Minimum-Fare Regulation currently found in Section 16.40.480(B) was codified as § 16.40.480(C) during the period relevant to the issues before the court. The court will refer to the regulation as § 16.40.480(B).

would not charge less than fifty dollars for a ride to the Airport even if the Airport-Fare Regulation was not in place. (Coe Dep. 78:3-10.) Similarly, Speed's would never charge less than the 35% premium required by the Minimum-Fare Regulation unless it was offering a special deal to encourage new customers to take a ride with them. (Porter Dep. 60:25-61:5.)

Coe feels the inability to give customers immediate rides to a restaurant and to offer discounted rates in a promotional offer have detrimentally affected Speed's ability to maintain goodwill with existing customers or develop goodwill with prospective customers. (Coe Dep. 50:6-51:15.) Coe estimated that Speed's Groupon.com promotion resulted in nearly six hundred and fifty purchases, one hundred of which he expected would be return customers. (Coe Dep. 27:11-17.)

The main complaint voiced by Thomas White, majority owner and chief executive officer of Fiesta ("White"), relates to the Airport-Fare Regulation which prevents Fiesta from offering a promotion with a discounted rate to obtain future customers. (White Dep. 18:25-19:16.) Fiesta has offered wine tours for $50 minimum on Groupon.com, which the City has allowed. (White Dep. 24:18-25:8.) Fiesta also objects to the Wait-Time Regulation which prevents it from servicing customers who need transportation within an hour. (White Dep. 6:2-4; 50:11-22.)

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2012). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of

a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2012). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

/ / / / /

/ / / / /

*Discussion*

In their Second Claim for Relief, Plaintiffs assert the Regulations violate the Substantive Due Process Clause. Plaintiffs contend the Regulations are not rationally related to a legitimate government purpose but were created solely to protect taxicab companies from competition at the expense of Plaintiffs.

The City argues Plaintiffs have failed to establish the Regulations are a complete barrier to Plaintiffs' protected interest in running an Executive Sedan company in the City based on evidence that Plaintiffs are still in business. Alternatively, the City argues Plaintiffs have failed to present evidence to support their claim that the Regulations were adopted for the sole purpose of providing economic protection to taxicab companies. Finally, the City argues the Regulations are rationally related to a legitimate governmental interest.

I. Constitutionally Protected Interest

The Substantive Due Process Clause provides that no state shall "deprive any person of life, liberty or property without due process of law." U.S. CONST. amend. XIV, § 1. "To state a substantive due process claim, the plaintiff must show as a threshold matter that a state actor deprived it of a constitutionally protected life, liberty or property interest." *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008). The "liberty component of the Fourteenth Amendments Due Process Clause includes some generalized due process right to choose one's field of private employment" but mere interruption of a right to engage in a calling is insufficient to support a substantive due process claim. *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999). Where the failure to comply with a regulation results in a complete bar to the pursuit of an occupation, a person's liberty interest in pursuing such occupation is sufficiently impacted to support a claim under the

Substantive Due Process Clause. *Dittman v. State of California*, 191 F.3d 1020, 1029 (9th Cir. 1999). Additionally, "[business goodwill] is a property interest entitled to protection; the owner cannot be deprived of it without due process." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 65 (9th Cir. 1994)(quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989)).

### A. Standing v. Element of Claim

At oral argument, Plaintiffs asserted that deprivation of a constitutionally protected interest is in effect a question of plaintiff's standing to assert a claim under the Substantive Due Process Clause. In *Wedges/Ledges*, the court addressed the issue of whether the plaintiffs had standing to bring suit, and made clear that standing is a separate consideration from the question of whether a plaintiff has a protectable interest for due process purposes. The court rejected the defendant's argument that because one of the plaintiffs, who was the manufacturer and distributor of the gaming machines temporarily banned by the defendant, was not attempting to obtain an operator's license, it did not suffer any injury as a result of the ban. The court explained:

> The City appears to base its standing challenge on the belief that Wedges/Ledges, as the manufacturer rather than an operator of the games, cannot claim to have suffered injury to itself as a result of the City's actions. This claim is without merit. Each of the plaintiffs, including Wedges/Ledges, claimed in the complaint to have suffered "lost sales, lost profits, lost business opportunities, and other economic harms" as a "proximate result" of the City's policies with respect to crane game licenses. Wedges/Ledges, no less than the other plaintiffs, is claiming that the City's policies were aimed at and, at least in part, succeeded in destroying the market for crane games in the Phoenix area.

*Id.* at 61. The court observed the manufacturer/distributor had alleged actual economic injury because of the defendant's actions, and held the allegation of actual economic injury was sufficient to give that plaintiff standing to bring its due process claims. *Id.* The court then observed, as to the

"prudential limitations on standing," that the plaintiff satisfied this test as well because it, in fact, was asserting its own due process rights with respect to the damage to its good will and the loss of the right to pursue an occupation. *Id.* at 62. The court noted that the manufacturer/distributor could not, however, proceed on claims other than these because "it lacks standing to assert the claims based solely on the property and liberty interests of the [machine] operators." *Id.* The Ninth Circuit then addressed the plaintiffs' due process claims and, specifically, the good will and right to pursue an occupation arguments asserted by both plaintiffs. *See Id.* at 64-66.

The court's sequential analysis of the manufacturer/distributor's arguments – first addressing standing, then addressing the substantive due process claims themselves – makes clear that standing is a separate concept and a separate legal analysis from the elements of a substantive due process claim. Thus, Plaintiffs err in contending the cases really are about standing rather than establishing an unequivocal due process requirement of proving a complete bar to pursuing one's occupation. One must first have standing before one can then argue a protected interest has been violated.

Here, there is no dispute Plaintiffs have standing to bring their due process claims. This does not, however, resolve the question of whether Plaintiffs have suffered a deprivation of a constitutionally protected life, liberty or property interest, which is an element of a claim for violation of the Substantive Due Process Clause.

### B. Complete Bar to Pursuit of Occupation

The Ninth Circuit has clearly established that a regulation must completely bar a plaintiff's pursuit of an occupation to support a claim for violation of the Substantive Due Process Clause. In *Dittman*, the Ninth Circuit held that a regulation requiring an acupuncturist to disclose her social security number as a prerequisite to practicing that profession in the state of California operates as

a complete barrier to the pursuit of such profession. *Dittman*, 191 F.3d at 1029. If an applicant refuses to disclose her social security number, the state will not issue a license, thereby preventing the applicant engaging in her desired profession in that state. *Id.*[9]

A temporary restriction on the provision of some services is not sufficient. In *Wedges/Ledges*, the Ninth Circuit addressed a temporary ban imposed on a specific type of amusement game operated and manufactured by the plaintiffs. The court found the ban did not bar the plaintiffs from engaging in their chosen profession explaining that "the fact that the [c]ity temporarily banned one particular type of amusement game does not in itself establish that the [c]ity unduly interfered with either the game operators' or manufacturers' ability to pursue their livelihood in the amusement game industry." *Wedges/Ledges*, 24 F.3d at 65. *Id.* In so holding, the court relied on its prior holdings in *Di Martini v. Ferrin*, 889 F.2d 922 (9th Cir. 1989), and *FDIC v. Henderson*, 940 F.2d 465 (9th Cir. 1991), that in the absence of charges which impugn an employee's morality or honesty, or the blacklisting of the employee from future employment in his field of choice, the termination of an employee did not preclude future work in the employee's chosen profession and, therefore, was not sufficient to establish a deprivation of property or liberty interest necessary to support a due process claim. *Wedges/Ledges*, 24 F.3d at 65.

/ / / / /

---

[9]The *Dittman* court ultimately found that the regulation was rationally related to fitness to practice. *Id.* at 1031. Importantly, the court noted it is enough if the state could have had a legitimate reason (a "conceivable basis") for the requirement, not simply whether an actual reason existed; either fulfills the rational relationship requirement. *Id.* The court found the Social Security Number requirement rationally related and noted "[t]he wisdom of that requirement is not for us to judge." *Id.* at 1032. The Ninth Circuit affirmed the trial court's grant of summary judgment on this basis.

Plaintiffs allege the Regulations "prevent Plaintiffs from offering prompt, efficient, and affordable service to customers" and force Plaintiffs to charge more for Executive Sedan services than they would otherwise willingly charge; that failure to comply with the Regulations may result in the revocation, restriction, or refusal to renew Plaintiffs' company and vehicle permits; and that Plaintiffs have lost hundreds of new customers and substantial income, as well as the goodwill of of both existing and potential customers, as a result of the Regulations. (Compl. ¶¶ 61, 63, 64.) This court previously found that, viewing these allegations as true and in a light most favorable to Plaintiffs, Plaintiffs had adequately alleged the deprivation of a constitutionally protected interest in both their right to pursue their chosen occupation and in the goodwill associated with their Executive Sedan businesses. The question now before the court is whether Plaintiffs have offered adequate evidentiary support for these allegations.

1. Fare Regulations

There is no dispute that the City, after discovering Plaintiffs' Groupon.com promotions, which admittedly violated the Fare Regulations, informed Plaintiffs that their company and vehicle permits would be suspended and fines assessed if Plaintiffs failed to cancel the promotions and refund all the money collected. Plaintiffs did, in fact, cancel the promotions and refund the money and have continued to provide Executive Sedan services without interruption. Accordingly, Plaintiffs were not deprived of the right to pursue their chosen occupation but were merely deprived of the right to advertise or promote their businesses by offering reduced rates which violate the Fare Regulations. Plaintiffs have failed to present evidence that their inability to offer reduced-fare promotions has prevented, or will in the future prevent, them from operating Executive Sedan services.

First, both Plaintiffs continued to provide Executive Sedan services. The evidence establishes that Plaintiffs' Executive Sedan businesses have grown in the past few years despite the restrictions imposed by the Fare Regulations. Coe admits that while the Regulations impose considerable restrictions on his business, he is still able to provide daily rides to customers that are outside of those restrictions. (Coe Dep. 26:1-7.) In fact, Speed's operated at a net profit in October, November, and December of 2013, for the first time since 2009. (Leatham Decl. ¶¶ 5, 20, 22.) Similarly, Fiesta continues to provide Executive Sedan services on a daily basis and, in fact, has increased its Airport trips, from three to five a week up to three to five per day in the fall of 2013. (White Dep. 18:17-19:3; White Decl. ¶ 11.) With the exception of the Groupon.com promotion, Plaintiffs have not had issues complying with any of the Regulations or been fined or cited by the City for violation of the Regulations. (White Decl. ¶ 22, Leatham Decl. ¶ 41.)

Second, the evidence shows that the City has overlooked minor violations of the Fare Regulations. While the City threatened to suspend Plaintiff's company and vehicle licenses, and impose large fines, based on Plaintiffs' Groupon.com promotions and resulting sale of nearly one thousand reduced-fare trips, the City did not discipline Speed's in any way for providing service to a few customers who purchased the Groupon.com promotion based on the City's understanding that Speed's was confused about the propriety of the promotion. Accordingly, Speed's violated the Fare Regulations but was not fined or barred by the City from continuing to provide transportation services.

Third, contrary to Plaintiffs' allegations that they would willingly charge less than the fares required in the Fare Regulations, Speed's represented it would not charge less than $50 for a ride between the Airport and downtown even in the absence of the Airport-Fare Regulation and would

never charge less than the amount imposed by the Minimum-Fare Regulations, unless it was offering a promotion to entice new customers. (Coe Dep. 78:3-7; Tucker Dep. 60:25-61:5.) In fact, Speed's generally charges $60 for a trip from downtown to the Airport and almost never charges less than $50 for trips within the downtown area. (Leatham Decl. ¶ 23; Tucker Dep. 61:7-19.) Consequently, the Fare Regulations do not impact Speed's regular fares but only the reduced fares they occasionally want to offer to entice new customers.

Finally, the Regulations do not prevent Plaintiffs from engaging in forms of advertising or marketing that do not offer reduced fares in violation of the Fare Regulations. Speed's currently advertises through broadcast emails, its website and facebook, and has also advertised on radio and television, and in the yellow pages. (Coe. Dep. 33:19-24; Leatham Dep. 20:10-19; Porter Dep. 51:23-52:14.) Additionally, Speed's attended wedding and travel trade shows, mailed flyers to existing contacts and high-priced homes, and hired a salesperson to promote Speed's to large local businesses, such as Nike, Adidas, Intel, Columbia, and Wyden & Kennedy. (Porter Decl. ¶ 8.) Fiesta advertises through the internet and the yellow pages. (White Dep. 29:5-23.)

Plaintiffs consider Groupon.com or Living Social promotions to be the most effective for the cost involved and argue that their inability to offer these reduced-fare promotions prevents them from generating a sufficient customer base to run a profitable business. (Leatham Decl. ¶¶ 24, 39, 43; Porter Decl. ¶¶ 8, 9, 15, 16, 24; Coe Decl. ¶¶ 9-13, 19; Tucker Decl. ¶¶ 15-20; White Decl. ¶¶ 12, 18.) However, the evidence establishes that Plaintiffs have engaged in reduced-fare promotions that do not implicate the Fare Regulations. Nine months prior to the Groupon.com promotion, Speed's executed a relatively successful promotion on Living Social that did not violate the Fare Regulations because it did not involve rides within the downtown core area. (Porter Dep. 48:23-

49:22.) Similarly, Fiesta has successfully offered discounted rides to wine country on Groupon.com. (White Dep. 24:18-25:8.) Plaintiffs have failed to present evidence that reduced-fare promotions offering service within the City's core area which violate the Fare Regulations generate more new customers than those which do not. If the purpose of the reduced-fare promotion is to entice new customers to experience Plaintiffs' Executive Sedans and superior service, the purpose is equally served by those promotions that do not violate the Fare Regulations.

Plaintiffs have successfully continued to pursue their chosen professions while complying with the Fare Regulations. Despite Plaintiffs' allegations that the Fare Regulations force them to charge more than they otherwise would, the evidence establishes that Plaintiffs, or at least Speed's, would charge less than the fares required by the Fare Regulations only if it was involved in a reduced-fare promotion. Accordingly, Plaintiffs' complaint with the Fare Regulations is limited to their ability to offer reduced-fare promotions. Plaintiffs engage in alternative forms of advertising and have both successfully offered reduced-fare promotions that do not violate the Fare Regulations allowing new customers to experience the unique service offered by Executive Sedan companies as compared to taxicab companies.

Plaintiffs have, at best, presented evidence that the Fare Regulations prevent them from offering reduced-fare promotions involving travel within a limited area of the City. This minor limitation on Plaintiffs' ability to advertise their services does not equate to the complete bar of the pursuit of a chosen occupation as required by the Ninth Circuit to support a claim for violation of the Substantive Due Process Clause.

/ / / / /

/ / / / /

2. Wait-Time Regulation

Plaintiffs have not presented any evidence that the Wait-Time Regulation is a complete bar to their Executive Sedan businesses. Plaintiffs represent only that they have lost customers who desired immediate transportation which Plaintiffs were unable to provide without violating the Wait-Time Regulation. The loss of a few customers does not equate to an complete inability to engage in a business.

*B. Deprivation of Business Good Will*

Plaintiffs also allege that Plaintiffs have lost hundreds of new customers and substantial income, as well as the goodwill of both existing and potential customers, as a result of the Regulations. (Compl. ¶¶ 65, 67 - 68.) Plaintiffs expected that once customers who bought the discounted deals offered on Groupon.com experienced their services, a number of them would become return customers. (White Dep. 17:25-18:16; Coe Dep. 27:11-17.) Plaintiffs have also represented it was forced to turn away customers who requested immediate transportation services in violation of the Wait-Time Regulation.

Federal courts "look to state law to determine if business goodwill is properly characterized a property interest." *Wedges/Ledges*, 24 F.3d at 65. This court recently addressed the question of whether Oregon courts recognize business goodwill and as a protectable property interest in *Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174 (2011). In *Westwood*, the court acknowledged that under Oregon law, a value exists over and above the value of a businesses assets, which is referred to as "goodwill" value, and that Oregon courts have generally defined such goodwill as the:

> favor or advantage in the way of custom that a business has acquired beyond the mere

> value of what it sells whether due to the personality of those conducting it, the nature of its location, its reputation for skill or promptitude or any other circumstance incidental to the business and tending to make it permanent.

*Id.* at 1197 (quoting *In re Marriage of McDuffy*, 184 Or. App. 359, 365 (2002)). The court specifically recognized that "Oregon courts[, however,] have declined to assign a value for goodwill when there is no evidence in the record that any goodwill exists." *Westwood*, (citation omitted in original). The court found that the plaintiffs' allegations of the existence of goodwill associated with their business was not sufficient to establish a protectable property interest in the absence of evidence in the record to support such allegations. *Id.* Federal courts have also clearly held that "damage to the reputation of a business, without more, does not rise to the level of a constitutionally protected property interest." *WMX Technologies, Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir. 1999) (citing *Paul v. Davis*, 424 U.S. 693 (1976)().

Plaintiffs have failed to support their allegations that they have created goodwill value over and above their business assets. Plaintiffs present no evidence they have created a distinct favor or advantage over similar businesses as a result of the unique way in which they conduct their businesses. In the absence of such evidence, Plaintiffs have not established the requisite property interest based on goodwill.

Similarly, Plaintiffs have failed to offer definitive evidence that their alleged goodwill was damaged by the Regulations. Clearly, existing customers are aware of the required one-hour wait time and the fares charged by Plaintiffs and have not been deterred from using Plaintiffs' services. Plaintiffs have presented no evidence establishing that it lost current customers as a result of the Regulations. To the contrary, Plaintiffs existing customer base was generated while the Regulations were in effect.

Plaintiffs have also failed to establish the presence of any goodwill with prospective customers that was, or would be, damaged as a result of the restrictions imposed by the Regulations. The new customers who participated in the Groupon.com promotion were enticed to do so by the reduced fare, not any goodwill created by Plaintiffs. Therefore, the cancellation of the promotion would have no effect on Plaintiffs' goodwill with regard to these customers. Also, the evidence reveals that both Plaintiffs obtained at least one new customer as a result of the Groupon.com promotions. Speed's provided services to several customers purchasing the Groupon.com promotion before the City required Speed's to cancel the promotion. (DuFay Dep. 103:24-104:7.) Fiesta provided services for about a year and a half to a customer who became aware of its services as a result of the Groupon.com promotion. (White Decl. ¶ 18.) Also, Plaintiff have both increased their business despite any possible detrimental effect the Regulations may have on the Plaintiffs' alleged goodwill.

Plaintiffs have not established they have a protectable property interest in the alleged goodwill of their companies. Plaintiffs have also failed to offer evidence to support their claim the Regulations have deprived them of their alleged goodwill resulting in the loss of either current or prospective customers. Accordingly, Plaintiffs are unable to rely on damage to the goodwill value of their companies as deprivation of a property right in violation of the Substantive Due Process Clause.

## II. Economic Protectionism and Rationally Related to Legitimate Government Interest

The court has found Plaintiffs' have failed to present evidence sufficient to establish the Regulations are a complete bar to Plaintiffs' pursuit of their chosen occupation, Plaintiffs have created goodwill value in their companies, or the Regulations deprived them of any goodwill value

that may exist. As such, Plaintiffs are unable to support a claim for violation of the Substantive Due Process Clause and the court need not, and will not, address the questions of whether the Regulations were intended solely to provide economic protection to taxicab companies or are rationally related to a legitimate government interest.

*Conclusion*

The City's motion (#58) for summary judgment is GRANTED.

DATED this 20th day of June, 2014.

_____
JOHN V. ACOSTA
United States Magistrate Judge